# BELEY *v.* NAPHTALY.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH
CIRCUIT.

No. 180. Submitted January 5, 1898. — Decided February 28, 1898.

The patent to the defendant in error does not preclude this court from inquiring into the effect of the act of July 23, 1866, c. 219, "to quiet land titles in California;" and the court holds that that act does not require proof of an actual grant from the Mexican authorities to some grantee through whom the title set up is derived; but that the proper officers of the United States had jurisdiction to issue a patent upon being satisfied of the existence of those facts in regard to which it was their province to determine; and that the act includes those who, in good faith and for a valuable consideration, have purchased land from those who claimed and were thought to be Mexican grantees or assigns, provided they fulfil the other conditions named in the act.

The facts in this case do not show, as matter of law, that Millett could not have been a *bona fide* purchaser of these lands for a valuable consideration; and whether in fact he were so was a fact to be determined by the Government on the issue of the patent, which precluded further inquiry into that question.

A person who was within the statute and had the right to purchase land as provided therein, could assign or convey his right of purchase and his grantee could exercise that right.

The rejection by the Secretary of the Interior of the first application made by the defendant in error for a patent, and the subsequent granting of a rehearing and the issuing of a patent thereafter were all acts within his jurisdiction.

THE defendant in error, who was the plaintiff below, brought this action in the Circuit Court of the United States for the Northern District of California to recover the possession of certain lands described in his complaint; and also the value of the rents, issues and profits thereof. He alleged that he was the owner in fee of the lands in question and entitled to their possession, and that while such owner the defendants wrongfully entered upon the lands and ousted him therefrom, and have since wrongfully withheld from him the possession thereof. He further alleged that he was the owner of the land by virtue of a patent duly and regularly issued to him by the United

States in the year 1893, under and in pursuance of the provisions of the act of Congress of April 24, 1820, c. 51, 3 Stat. 566, entitled " An act making further provision for the sale of the public lands," and the acts supplemental thereto, and also under the provisions of section 7 of the act of Congress of July 23, 1866, c. 219, entitled "An act to quiet land titles in California," and that the defendants denied the validity of that patent.

The defendants answered, denying the various allegations of the complaint, and the case came to trial without a jury, a jury having been waived by all the parties.

The plaintiff put in evidence the patent issued to him from the United States for the land described in the complaint, and proved that while he was in the peaceable and quiet possession of such land the defendants entered upon it and ousted him therefrom, and have ever since detained the land from him. He also proved its rental value.

The bill of exceptions contains the following:

"It was then admitted by the defendants' counsel that at the time of the issuance of the patent hereinbefore described the lands therein and in the complaint described were public lands of the United States, subject to sale under the laws of the United States. It was here conceded by defendants' counsel that defendants did not propose to connect themselves in any manner or form with the title of the United States to the premises described in the complaint herein, or any part thereof, either by certificate of purchase, patent or anything of the kind.

" The plaintiff then rested."

The plaintiff's action rests primarily upon section 7 of the statute of the United States, entitled "An act to quiet land titles in California," approved July 23, 1866. 14 Stat. 218, 220. That section, so far as material, reads as follows:

" SEC. 7. *And be it further enacted,* That where persons in good faith, and for a valuable consideration, have purchased lands of Mexican grantees or assigns, which grants have subsequently been rejected, or where the lands so purchased have been excluded from the final survey of any Mexican grant, and

have used, improved and continued in the actual possession of the same according to the lines of their original purchase, and where no valid adverse right or title (except of the United States) exists, such purchasers may purchase the same, after having such lands surveyed under existing laws, at the minimum price established by law, upon first making proof of the facts as required in this section, under regulations to be provided by the commissioner of the general land office, joint entries being admissible by coterminous proprietors to such an extent as will enable them to adjust their respective boundaries."

To maintain their defence, the defendants then offered in evidence the application made by the plaintiff to purchase the lands from the United States pursuant to the seventh section above quoted. The application and the accompanying papers were offered for the purpose of showing that there had, in fact, never been any grant from the Mexican government to the Romeros, through whom, as supposed Mexican grantees, the plaintiff below derived his claim, and by reason of which claim he had made application to the land office under the provisions of the seventh section of the above-mentioned act of Congress. The papers offered in evidence by defendants showed that while the country was under Mexican rule the Romeros had taken proceedings to obtain a grant of lands, which included the land in question, from the Mexican government, and that such proceedings had certainly gone as far as a final decree by the governor providing for the making of a grant asked for, but there was no record evidence of any actual grant ever having been made. The facts as to the documentary evidence in the case are fully set forth in the report of the case of *Romero* v. *United States*, 1 Wall. 721.

The evidence so offered by defendants was objected to on the part of the plaintiff as immaterial, incompetent and irrelevant for the purpose of affecting the validity of the patent under which the plaintiff claimed title to the lands in question. The court sustained the objection and the defendants duly excepted. Thereupon the defendants rested, and the court ordered judgment to be entered in favor of the plaintiff and

against the defendants for a recovery of the land in accordance with the prayer of the complaint. This judgment was affirmed by the United States Circuit Court of Appeals for the Ninth Circuit, 44 U. S. App. 232, and the case is brought here for review.

*Mr. Henry F. Crane* for plaintiffs in error.

*Mr. A. T. Britton* and *Mr. A. B. Browne* for defendant in error.

MR. JUSTICE PECKHAM, after stating the facts, delivered the opinion of the court.

I. The defendant in error insists that his patent is conclusive evidence that he is a purchaser within the meaning of the seventh section of the statute above quoted, and that no fraud being alleged, no evidence can be received for the purpose of in any other way invalidating the patent issued to him by the Government of the United States.

The patent does not preclude this court from construing the act of 1866, nor does it preclude an inquiry by the court whether the patent was issued without authority or against the expressed will of Congress, as manifested in the statute. *Burfenning* v. *Chicago &c. Railway*, 163 U. S. 321, and cases there cited. If it were so issued, it is the duty of the court to give no weight to it. The proper construction of the act of 1866 is, therefore, the first question to be considered.

In order that a person may avail himself of that act, is it necessary that an actual grant from the Mexican authorities to some grantee through whom the title is derived should be proved? If so, the judgment in favor of the plaintiff in this case must be reversed, as no such grant was proved. We are of opinion, however, that the statute does not require proof of such a grant.

When the United States took possession of that portion of the country in which the lands in question are situated, it is public knowledge that there were many claims made by

private individuals to lands under alleged grants from the preceding Mexican government. In order to ascertain and settle the questions arising thereunder, Congress, on the 3d of March, 1851, passed an act, c. 41, 9 Stat. 631, in which a commission was constituted and before which claims of that character might be proved. The eighth section provided, " That each and every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government, shall present the same to the said commissioners when sitting as a board, together with such documentary evidence and testimony of witnesses as the said claimant relies upon in support of such claims; and it shall be the duty of the commissioners, when the case is ready for hearing, to proceed promptly to examine the same upon such evidence and upon the evidence produced in behalf of the United States, and to decide upon the validity of the said claim, and, within thirty days after such decision is rendered, to certify the same, with the reasons on which it is founded, to the district attorney of the United States in and for the district in which such decision shall be rendered."

It will be noticed that the jurisdiction here given was only to decide upon the validity of the claim presented, and if the commission decided that the claims were not valid ones, as derived from the Mexican or Spanish government, it was the duty of the commission to reject them. Provision was made for a review of the decision of the commissioners by the District Court of the district in which the lands claimed were situated, which court, upon such review, was authorized and required " to decide on the validity of such claim," and an appeal from the decision of the District Court was allowed to be taken to the Supreme Court of the United States.

It appeared, from the documents offered in evidence in this action, that the Romeros had presented their claim to this commission, which had rejected it as not being a valid claim, and this rejection had been affirmed by the District Court and by the Supreme Court in the case in the first of Wallace, mentioned above. There must undoubtedly have been, at the time of the enactment of the act of 1866, many cases existing

in that part of the country, where claims of *bona fide* purchasers for value founded upon supposed rights or grants derived from the Mexican or Spanish government had been held to be invalid by the commission appointed under the act of 1851, and where, notwithstanding such decision, the claimants had remained in possession of the lands as originally acquired by them, there being no valid adverse right or title to the lands of which they were in possession, excepting that of the United States. This would have been the natural result arising from the difficulty in making formal and sufficient proof before the commission of valid rights and titles derived from the Mexican or Spanish government. It was only valid claims that the commission had power to allow. Where claims had been made and theretofore adjudged invalid by the Supreme Court of the United States, Congress had, in some instances, by private act, permitted those who were *bona fide* purchasers from the claimant whose claim had been adjudged invalid, or from his assigns, to enter the land so purchased according to the lines of the public surveys then provided for, at $1.25 per acre, to the extent to which the lands had been reduced to possession at the time of the adjudication by the Supreme Court. Such is the act, approved March 3, 1863, c. 116, 12 Stat. 808, entitled "An act to grant the right of preëmption to certain purchasers of the 'Soscol Ranch' in the State of California." See also a similar act, approved June 17, 1864, c. 133, 13 Stat. 136; also the act approved July 2, 1864, c. 218, 13 Stat. 372; also the act approved March 3, 1865, c. 115, 13 Stat. 534.

Other acts were also passed by Congress recognizing in effect the equitable rights of parties who were grantees of those who had claimed a right or title under the Mexican or Spanish government, and which right or title had subsequently been held to be invalid by the courts of our own Government. The hardship to be relieved from by these special acts and by the general act of 1866 did not solely exist in the fact that there had been a formal grant from the Mexican authorities, which was in some manner defective, so that no valid claim or right could grow out of such grant, but it also existed when a claimant in possession of land which he

had *bona fide* and for a valuable consideration purchased of one who claimed his right or title from the Mexican or Spanish government by way of a grant therefrom, was nevertheless unable to prove such grant, and as a consequence could not prove any valid title or claim in himself. Whether such invalidity were on account of some defect in the proceeding which resulted in a defective grant or whether it existed by reason of an inability to prove an actual grant was not material, so long as the claim of title actually rested upon what was in good faith supposed to have been a valid claim under the government of Mexico, and so long as there was no valid adverse right or title other than that of the United States. Persons occupying lands which they possessed under such circumstances and by such a claim were entitled to considerate treatment from the Government of the United States. They had in good faith paid a valuable consideration for the land of which they were in possession by virtue of such purchase, and they ought to have the first right to make good their title by purchase from the Government at the lowest price named.

The defendants on the trial conceded these lands were, when the patent in this case was issued, public lands of the United States, subject to sale under the laws thereof, and that they did not intend to connect themselves in any manner or form with the title of the United States to the lands in question. There is no proof or offer of any proof in the record tending to show the existence of any adverse valid claim to the land, other than the United States, and the admission just alluded to taken in connection with the absence of such proof shows that when the patent issued there existed in fact no other adverse valid claim upon the land than that of the United States. Those who could not show actual grants from the Mexican government might nevertheless have equities quite as strong in their favor as those who could show an actual grant which was defective. The act of Congress should not be so construed as to except from its remedial provisions those who were without an actual grant while at the same time filling every other requirement of the act, unless the language used therein is open to no other interpretation.

"Such a construction ought to be put upon a statute as will best answer the intention which the makers had in view, for *qui hæret in litera, hæret in cortice.* In Bacon's Abridgment, Statutes 1, 5; Puffendorf, book 5, chapter 12; Rutherford, pp. 422, 527; and in Smith's Commentaries, 814, many cases are mentioned where it was held that matters embraced in the general words of statutes, nevertheless were not within the statutes, because it could not have been the intention of the lawmakers that they should be included. They were taken out of the statutes by an equitable construction. . . . In some cases the letter of a legislative act is restrained by an equitable construction; in others it is enlarged; in others the construction is contrary to the letter. The equitable construction which restrains the letter of a statute is defined by Aristotle, as frequently quoted, in this manner: *'Æquitas est correctio legis generaliter latæ qua parti deficit.'*" *Riggs* v. *Palmer,* 115 N. Y. 506, 510. Opinion by Earl, J.

Construing the act of Congress of 1866 under the circumstances above outlined, and in view of the general rules of construction already stated, we hold that the provisions of the seventh section of that act include such a case as this. The purpose of the act is to quiet titles in California, and, as stated by the court below, it is a remedial statute and one entitled to a liberal construction in order to effect the purpose and object of its enactment. When the act, therefore, speaks of *bona fide* purchasers for a valuable consideration of lands from Mexican grantees or assigns, which grants have subsequently been rejected, we do not think that the words "grantees" and "grants" should have such a rigid and technical construction as to require the actual existence of a formal grant from the government of Mexico, but we are of opinion the act should be construed in accordance with what we conceive to have been its plain purpose, which was to cover the case of those persons who in good faith and for a valuable consideration have purchased lands (and taken and retained their possession) from those who claimed and were supposed to be Mexican grantees, but whose claims had been subsequently rejected. Otherwise, it seems to us clear that the purpose for which this

seventh section was passed would be so circumscribed as to reduce it to much narrower limits than the known mischief to be remedied called for.

The circumstances existing at the time of the passage of this act necessarily lead to the belief that the purpose of its enactment was to remedy (by purchase of the land from the United States at the lowest rate) a defect in a title supposed to have been derived from the Mexican government, where the claimant had in good faith and for a valuable consideration purchased from one who claimed to be a Mexican grantee, or from his assigns, and where there was no adverse claim other than that of the United States. A remedial statute ought not to be so construed as to defeat in part the very purpose of its enactment. *United States* v. *Hodson*, 10 Wall. 395.

In the case now before us it appears there had been very strong parol evidence of the existence of an actual grant from the Mexican government, but it was not thought to be strong enough to overcome the absence of any record evidence of such a grant. We think that under the statute of 1866 record proof of the existence of a grant was not necessary in order to give the officers of the United States jurisdiction to issue the patent upon being satisfied of the existence of those facts in regard to which it was their province to determine. The act has received the same construction in the Supreme Court of California in the case of *Bascomb* v. *Davis*, 56 California, 152. The court there construed it so as to include those who in good faith and for a valuable consideration had purchased lands which were supposed to have been granted by the Mexican government, and who had used, improved and continued in the actual possession of the lands as provided in the act. This construction by the California court is entitled to very high consideration, and especially is this so in a case where the act was directed to a condition of things in existence at the time of its passage and with which the courts of that State would be particularly familiar.

In *Winona & St. Peter Railroad* v. *Barney*, 113 U. S. 618, this court construed an act of Congress which alluded to lands "granted as aforesaid" as including lands *purporting* to have

been "granted as aforesaid," and this inclusion was made because the court was satisfied, taking all things into consideration, that such construction was what Congress meant.   The court simply carried out that intention by supplying a word not found in the act.

For the reasons thus given we think this act includes those persons who in good faith and for a valuable consideration have purchased land from those who claimed and who were thought to be Mexican grantees or assigns, provided they fulfil the other conditions named in the act.

II. Coming to the conclusion we have, there is another objection made to the title on the part of the plaintiffs in error. They urge that the statute requires that the person who purchased the land should have made his purchase from the Mexican grantee or his assignee in good faith, and it is stated that as the defendant in error made his purchase from a remote grantee of the Romeros on the 15th of May, 1876, twenty years after the claim had been rejected by the commissioners appointed under the act of 1851, eighteen years after it had been rejected by the United States District Court, and thirteen years after it had been rejected by this court, it was clear as a legal result from these facts that he could not be a purchaser in good faith.

It appears however that on the 8th of August, 1859, one S. P. Millett became a grantee and entered into the possession of the lands, used, improved and cultivated them, and continued in the actual possession thereof according to the lines of the original purchase until 1868, and that the defendant in error claims through Millett by several mesne conveyances. Plaintiffs in error object that Millett was not a purchaser in good faith because he did not purchase until October, 1859, before which time the claim of the Romeros had been rejected by the commissioners and by the United States District Court. An appeal from those decisions was pending at the date above mentioned before this court, and it was therein contended that the Romeros had a valid claim under the Mexican government such as should have been recognized by the commissioners and by the District Court, and such as ought to be recognized by

the Supreme Court.   We do not think the facts thus stated show, as matter of law, that Millett could not have been a *bona fide* purchaser of these lands for a valuable consideration, and whether in fact he were such *bona fide* purchaser was a question to be determined by the Government on issuing the patent, and an inquiry into that question of fact is precluded by the patent itself.

III.   It is also objected that even if Millett were adjudged a purchaser in good faith from a Mexican grantee, he could not convey to another his right under the statute of 1866, but that it was a mere personal privilege which he might exercise to purchase the land at the minimum price established by law. We think that a person who was within the statute and who had the right to purchase land as provided therein was not confined to the actual purchase himself, but that he could assign or convey such right, and that his grantee or assignee, immediate or remote, could, so far as this point is concerned, exercise the same right of purchase which he had before he conveyed or assigned.

In *Thredgill* v. *Pintard*, 12 How. 24, the court recognized the right of an individual in possession of land and who was entitled to a preëmption right therein to convey such right to another.

In *Webster* v. *Luther*, 163 U. S. 331, it was held that persons entitled under the Revised Statutes, section 2304, to enter a homestead, who may have theretofore entered under the homestead laws a quantity of land less than 160 acres, and who had the right under section 2306 to make an additional entry for the deficiency, could transfer such right by a proper conveyance.

In the above cases the general rule of law which discourages all restraints upon alienation was recognized, and the assignment of a right before entry was held valid, one of the reasons for such holding being that there was no restriction against such assignment contained in the act creating the right.   Nor is any such restriction to be found in the act of 1866.

Upon this question it must be assumed that Millett was a purchaser in good faith.   Being such a purchaser he could

assign his right and title to another, and the rights under such assignment were not affected by the fact that the defendant in error did not purchase his title until many years after the final determination by this court that no formal, actual or valid grant had ever been made by the Mexican government to the Romeros.

IV. We are also of opinion that the rejection by the Secretary of the Interior of the first application made by the defendant in error for a patent, and the subsequent granting of a rehearing and the issuing of a patent thereafter by the Secretary, were all acts within the jurisdiction of that officer. The fact that a decision refusing the patent was made by one Secretary of the Interior, and, upon a rehearing, a decision granting the patent was made by another Secretary of the Interior, is not material in a case like this. It is not a personal but an official hearing and decision, and it is made by the Secretary of the Interior as such Secretary, and not by an individual who happens at the time to fill that office, and the application for a rehearing may be made to the successor in office of the person who made the original decision, provided it could have been made to the latter had he remained in office. The Secretary who made the first decision herein, could have granted a rehearing and reversed his former ruling.

The case of *United States* v. *Stone*, 2 Wall. 525, has no bearing adverse to this proposition. In that case it was stated that a patent is but evidence of a grant, and the officer who issues it acts ministerially and not judicially; that if he issues a patent for land reserved from sale by law, such patent is void for want of authority, but that one officer of the land office is not competent to cancel or annul the act of his predecessor; that is a judicial act and requires the judgment of a court. The power to cancel or annul in that case meant the power to annul a patent issued by a predecessor, and this court held no such power existed. The officer originally issuing it would have had no greater power to annul the patent than had his successor.

Neither does *Noble* v. *Union River Logging Railroad*, 147

U. S. 165, touch the case. The principle therein decided was in substance the same as in the *Stone case, supra.* The control of the department necessarily ceased the moment the title passed from the Government. It was not a question whether a successor was able to do the act which the original officer might have done, but it was the announcement of the principle that no officer, after the title had actually passed, had any power over the matter whatever. After the Secretary of the Interior had approved the map as provided for in the act of Congress under which the proceedings were taken by the company, the first section of that act vested the right of way in the company. This was equivalent to a patent, and no revocation could thereafter be permitted. See also *Michigan Land & Lumber Co.* v. *Rust,* 168 U. S. 589, at 592.

We have considered the other questions raised herein but do not think any error was committed in their disposition by the courts below. The judgment of the Circuit Court of Appeals must be

*Affirmed.*

MR. JUSTICE HARLAN dissented.

---

SMITH *v.* NAPHTALY. Appeal from the United States Circuit Court of Appeals for the Ninth Circuit. No. 181. Submitted with No. 180. MR. JUSTICE PECKHAM delivered the opinion of the court. In this case, counsel for the appellant concedes that if the court should hold that the sale of the land mentioned in the patent involved in the foregoing case were a valid sale, then the judgment in this case should be affirmed. As we do so hold, the judgment herein is, therefore,

*Affirmed.*

MR. JUSTICE HARLAN dissented.

Same counsel and same briefs as in No. 180.